**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**CAROLYN TOUSIGNANT,**

                                **Plaintiff,**

  vs.                                                   **3:14-cv-01251
                                                              (MAD/DEP)**

**CAROLYN W. COLVIN, Commissioner of
Social Security,**

                                **Defendant.**
_____

**APPEARANCES:**                                     **OF COUNSEL:**

**LACHMAN, GORTON LAW FIRM**        **PETER A. GORTON, ESQ.**
P.O. Box 89
1500 East Main Street
Endicott, New York 13761-0089
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**    **JASON P. PECK, ESQ.**
Office of Regional General Counsel
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Carolyn Tousignant ("Plaintiff") commenced this action on October 13, 2014, pursuant to 42 U.S.C. § 405(g), seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for Disability Insurance Benefits ("DIB").[1] *See* Dkt. No. 1.

---

[1] While Plaintiff's complaint states that her application for supplemental security income ("SSI") was also wrongfully denied, *see* Dkt. No. 1, Plaintiff's initial application explicitly states that she was not applying for SSI, Dkt. No. 9, Administrative Transcript ("T."), at 146.

## II. BACKGROUND

Plaintiff's date of birth is February 17, 1955, which made her 56 years old at the time she protectively filed for DIB on January 9, 2012, and 49 years old at the time that she alleges her disability began on January 1, 2005. *See* Dkt. No. 9, Administrative Transcript ("T."), at 15. Plaintiff presented a time-line of her relevant life history to licensed clinical social worker Margo A. Falise, which was reported in a June 1, 2012 psycho-social assessment of Plaintiff. *See id.* at 325-32. The report indicates that Plaintiff was subjected to ongoing sexual, physical, and emotional abuse during her early childhood. *See id.* at 325-26. Plaintiff reported the onset of nightmares, sleep walking, and audio hallucinations prior to turning fifteen years old. *See id.* At this early age, Plaintiff was conditioned not to express any emotion or she would be beaten. *See id.* at 326. At age fifteen, Plaintiff's father kicked her out of their home and she lived in a boarding house until she graduated from high school. *See id.*

Plaintiff reported that, between the ages of nineteen and twenty three, she experienced audio hallucinations, she suffered from anxiety, depression, and post-traumatic stress symptoms, and she was "unable to maintain employment due to [her] inability to function." *Id.* At age twenty two, Plaintiff was the victim of a violent rape and, at twenty three, she was referred to admission in a psychiatric hospital after experiencing a mental breakdown. *See id.* After this, Plaintiff was seen by licensed professional counselor Michael Riggins for approximately eight to ten years during her twenties and thirties. *See id.* at 326-27. In a telephone conversation with Ms. Falise, Mr. Riggins indicated that Plaintiff had lived with him and his family for several years. *Id.* at 327. During that time, Plaintiff "presented with symptoms of anxiety, paranoia, delusions, fear of people, [an inability] to trust people, was withdrawn, isolated, secluded herself, was in a semi-catatonic state, was very suspicious of others [and] their intentions, [and] was

2

unable to maintain competitive employment." *Id.* Mr. Riggins reportedly diagnosed Plaintiff with anxiety, depression, and paranoid schizophrenia. *See id.*

On January 9, 2012, Plaintiff protectively filed an application for DIB claiming a period of disability that started on January 1, 2005 and continued until Plaintiff's date last insured ("DLI") on June 30, 2005. *See id.* at 144-47. Plaintiff claimed that her medical conditions of anxiety, depression, chemical imbalance, post traumatic stress disorder ("PTSD"), and her psychotic breaks limited her ability to work. *See id.* at 173. This application was initially denied on April 3, 2012. *See id.* at 75. Plaintiff then filed a written request for a hearing on April 17, 2012, and the claim was assigned to Administrative Law Judge Bruce S. Fein (the "ALJ"). *See id.* at 85-86. A hearing was held on March 15, 2013. *See id.* at 26-66. At that hearing, Plaintiff testified that she provided care for her nephew from 2003 until 2011 under the supervision of her husband and mother. *See id.* at 37-38. Plaintiff was not questioned regarding her mental functioning prior to 2005.

Plaintiff's husband, Robert F. Tousignant, testified that Plaintiff exhibited signs of anxiety in 2005, which included waking up with panic attacks, an inability to make simple decisions, and an inability drive a car. *See id.* at 41-42. Mr. Tousignant stated that he did not feel comfortable sending Plaintiff into public alone in 2005 because of her mental conditions. *See id.* at 42-43. Around 2005, Mr. Tousignant observed that Plaintiff became less engaged with family, she became less involved with household chores, she was unable to sleep through the night, she suffered from anxiety, and she was worried about "everything." *Id.* at 50-51. Mr. Tousignant testified that Plaintiff quit her housecleaning job in 2005 because "she couldn't get out of the house" due to her anxieties. *Id.* at 51. However, Plaintiff was still able to do the laundry and clean their house. *See id.*

3

Starting in 2002, Plaintiff's mother moved in with her and Mr. Tousignant so that Plaintiff would have someone with her throughout the day while her husband was at work. *See id.* at 44. From 2003 until June of 2011, Plaintiff worked as a respite worker for approximately two hours per day. *See id.* at 181. This position consisted of caring for her nephew with Down's Syndrome after he got home from school to make sure that he was fed and kept safe. *See id.* at 32, 37. During this care, Plaintiff was always in her own home and never had to drive a car to pick up her nephew. *See id.* Mr. Tousignant testified that either he or Plaintiff's mother accompanied Plaintiff at all times when she was watching her nephew. *See id.* at 45. Plaintiff stopped watching her nephew in early 2011 because she started to become increasingly nervous and felt that it was unsafe for the child to come to her house any longer. *See id.* at 46. Mr. Tousignant testified that he accompanied Plaintiff to her medical appointments with her psychiatrist, Dr. Kanchan Mahon, and her therapist, Margo Felise. *See id.* at 48.

Dr. Mahon testified at the hearing before the ALJ that she had treated Plaintiff for the previous three years. *See id.* at 55. When Dr. Mahon first started treating Plaintiff in 2010, she was "almost continuously psychotic." *Id.* at 58. After the first meeting, Plaintiff was prescribed medication that has reduced, but not eliminated, the frequency of her psychotic thinking. *See id.* at 59. Dr. Mahon stated that Plaintiff "suffers from schizophrenia" and has frequent episodes of psychosis. *Id.* at 55. According to Dr. Mahon, Plaintiff has been suffering from these conditions since she was approximately nineteen years old. *Id.* at 56. This determination of the onset age of Plaintiff's conditions was based upon Plaintiff's recitation of her life history, communications with licensed professional counselor Michael Riggins, reviewing Plaintiff's other medical records created after 2005, and Dr. Mahon's understanding that "schizophrenia rarely comes about in one's 50s," but usually "starts in late teen[s] or early 20s." *Id.* Plaintiff's cognitive abilities have

4

also started to decline, which is another symptom of schizophrenia that is consistent with her case. *See id.* at 57. Dr. Mahon stated that Plaintiff was previously wrongfully diagnosed with obsessive compulsive disorder, which should have been diagnosed as psychotic episodes. *See id.* at 61. Dr. Mahon concluded that Plaintiff would likely have been hospitalized because of her mental conditions if she did not have her husband at home to care for her. *See id.* at 65.

The ALJ issued a decision dated May 21, 2013 finding that Plaintiff was not disabled. *See id.* at 15-22. Plaintiff timely requested review, and when the Appeals Council denied Plaintiff's request for review on September 24, 2014, the ALJ's decision became the Commissioner's final decision. *See id.* at 1-5. In his decision, the ALJ found the following: (1) Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2005; (2) Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2005 through her DLI of June 30, 2005; (3) through the DLI, Plaintiff had the following medically determinable impairments: "hyperthyroidism, fibrocystic breast disease, status post right mastiodectomy, status post three right unsuccessful tympanoplasties, right otitis externa, anxiety disorder, and obsessive compulsive disorder;" (4) through the DLI, Plaintiff did not have a severe impairment or combination of impairments that significantly limited her ability to perform basic work related activities; and (5) Plaintiff was not under a disability, as defined in the Social Security Act, at any time from the alleged onset date through the DLI. *Id.* at 16-17, 21.

Plaintiff commenced this action for judicial review of the denial of her DIB claim by the filing of a complaint on October 13, 2014. *See* Dkt. No. 1. Both parties have moved for judgment on the pleadings. *See* Dkt. Nos. 13, 14. Having reviewed the administrative transcript, the Court orders that the Commissioner's decision is reversed and remanded for further consideration.

# III. DISCUSSION

## A. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). The Court must examine the administrative transcript to determine whether the correct legal standards were applied and whether the decision is supported by substantial evidence. *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *Schaal v. Apfel*, 134 F.3d 496, 500-01 (2d Cir. 1998). "A court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if it appears to be supported by substantial evidence." *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations and quotations omitted).

If supported by substantial evidence, the Commissioner's factual determinations are conclusive, and it is not permitted for the courts to substitute their analysis of the evidence. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

## B. Analysis

6

### *1. Five-step analysis*

For the purpose of DIB, a person is disabled when she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citations omitted). The claimant bears the burden of proof on the first four steps, while the Social Security Administration ("SSA") bears the burden on the last step. *Berry*, 675 F.2d at 467.

### *2. Weight of Medical Testimony*

Plaintiff submits that the ALJ committed error by giving great weight to an assessment by Dr. Apacible, a state agency medical consultant, while giving limited weight to Ms. Falise and Dr.

7

Mahon's medical assessments, giving limited weight to each of the four third-party statements, and by failing to consider Mr. Riggins' medical opinion in its entirety. *See* Dkt. No. 13 at 10-14. The Court finds that it was an error of law to accord the greatest weight to Dr. Apacible's opinion while according limited weight to Ms. Falise and Dr. Mahon's medical assessments and agrees with Plaintiff's argument that the final determination is not supported by substantial evidence. *See id.* at 4-19. For the reasons stated below, each of these issues independently are grounds to remand this case to the Commissioner for further proceedings.

The SSA regulations provide a framework for how to evaluate the opinions of non-examining medical sources, such as consultants or advisers. *See* 20 C.F.R. § 404.1527(e). The ALJ is required to explain in his decision the weight assigned to the opinions of program physicians unless a treating source's opinion is given controlling weight. *See id.* at § 404.1527(e)(2)(ii). Factors in the evaluation include consistency of the opinion with the record as a whole, "the consultant's medical specialty and expertise in [the SSA] rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." *Id.* It is the general rule that a medical adviser's opinions "deserve little weight in the overall evaluation of disability," because "[t]he advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant." *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990). "When the treating source has reasonable knowledge of [the claimant's] impairment(s), [the Commissioner] will give the source's opinion more weight than [the Commissioner] would give it if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(ii).

When an ALJ does not assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including: (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the SSA's attention that tend to support or contradict the opinion. *See id.* at § 404.1527(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). An ALJ may refuse to credit the treating physician's opinion only if he is able to set forth good reason for doing so. *Saxon v. Astrue*, 781 F. Supp. 2d 92, 102 (N.D.N.Y. 2011). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citation omitted).

Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The opinion of a treating physician is not afforded controlling weight only where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts. *Williams v. Comm'r of Soc. Sec.*, 236 Fed. Appx. 641, 643-44 (2d Cir. 2007). The less consistent an opinion is with the record as a whole, the less weight it is to be given. *Otts v. Comm'r of Soc. Sec.*, 249 Fed. Appx. 887, 889 (2d Cir. 2007).

First, in the present case, the ALJ's determination to accord great weight to the assessment of Dr. Apacible is not supported by substantial evidence. The entirety of Dr. Apacible's April 3,

9

2012 assessment consists of two checked boxes stating that there was insufficient evidence to establish Plaintiff's affective disorders. *See* T. at 303. The assessment fails to identify what records, if any, Dr. Apacible consulted and does not attempt to explain the final conclusion, despite being prompted for an explanation of why there was "insufficient evidence to substantiate the presence of the disorder." *See id.* at 303-16. Significantly, Dr. Apacible's report was completed before Plaintiff submitted numerous exhibits detailing the extent of her psychological conditions, which included three reports from Dr. Mahon, *see id.* at 333-37, 350-68, three reports from Ms. Falise, *see id.* at 322-32, 374-77, a letter from Mr. Riggins concerning his extended treatment of Plaintiff prior to the DLI, *see id.* at 371, and four separate statements from Plaintiff's family members detailing her inability to perform ordinary daily activities prior to the DLI, *see id.* at 197-206. Thus, Dr. Apacible's report is contradicted by the statements of each of Plaintiff's three treating medical providers, it is not supported by any other evidence in the case record, and it provides no "supporting explanations" for its final determination. *See* 20 C.F.R. § 404.1527(e)(2)(ii). For the reasons stated above and because he was not a treating medical provider, the ALJ erred in granting great weight to Dr. Apacible's medical assessment.

Second, the ALJ's determination to grant little weight to both Dr. Mahon and Ms. Falise's medical opinions is not supported by substantial evidence. *See* T. at 20. The ALJ granted little weight to the testimony of the two treating medical providers because "neither of the medical examiners provided [Plaintiff] with treatment prior to [the DLI]." *Id.* However, such determination was erroneous because each of the treating medical provider's opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Dr. Mahon and Ms. Falise based their opinions that Plaintiff's condition existed prior to the DLI

10

upon numerous visits with Plaintiff, *see* T. at 294-302, 350-62, conducting historical inquiries into Plaintiff's past psychological impairments, *see id.* at 325-32, communications with Plaintiff's previous counselor, Mr. Riggins, *see id.* at 369-73, and by consulting diagnostic recommendations from other experts on schizophrenia resulting from child abuse, *see id.* at 210-11. Thus, the medical techniques that Dr. Mahon and Ms. Falise relied upon, as well as the factual bases for reaching their conclusions, were medically acceptable and supported by all other medical reports, apart from Dr. Apacible's, in the case record.

Third, the ALJ erred by basing his credibility assessment of medical providers almost entirely on his assertion that Plaintiff did not seek psychiatric care prior to the DLI. *See id.* at 20. This conclusion is erroneous for two reasons. First, it fails to consider the explanations put forth as to why Plaintiff did not seek psychiatric care earlier and, second, the ALJ failed to consider Plaintiff's treatment by Mr. Riggins during her early adulthood. Multiple treating medical providers determined that Plaintiff intentionally avoided seeking medical treatment because of her paranoid delusions of being poisoned. Plaintiff's primary care physician stated that "[Plaintiff] does not like any idea of any kind of treatment or medication." *Id.* at 222. Plaintiff reported to Dr. Mahon that her fear of doctors has caused her to not report her psychotic symptoms to her therapists. *Id.* at 295. Dr. Mahon concluded that "[Plaintiff's] delusion of being poisoned has kept her from seeking a psychiatrist's care." *Id.* at 334. Ms. Falise stated that "it is highly probabl[e] that [the lack of medical documentation prior to the DLI] is either due to [Plaintiff's] avoidance of treatment and/or the lack of medical provider's psychiatric knowledge and limited documentation." *Id.* at 377. Further, the record before the ALJ contained an article from Dr. Bruce D. Perry explaining the difficulties of correctly diagnosing schizophrenia in patients with a childhood history such as Plaintiff's. *See id.* at 221. The Court finds that this explanation of why

11

Plaintiff delayed seeking treatment, coupled with the reports from Mr. Riggins that Plaintiff had, in fact, previously sought care for her psychological symptoms, establishes that the ALJ's decision to grant little weight to the treating medical providers' opinions is not supported by substantial evidence.

The record is devoid of any evidence, apart from Dr. Apacible's previously discussed assessment, demonstrating that Plaintiff was not disabled by her mental conditions prior to the DLI. Therefore, Dr. Mahon and Ms. Falise's medical opinions were not contradicted by "other substantial evidence" and should have been afforded controlling weight as treating medical providers. *See* 20 C.F.R. § 404.1527(c)(2).

### *3. Severe Impairments*

Step two of the five-step sequential evaluation requires that a claimant must suffer from a severe impairment in order to be found disabled under the Social Security Act. *See id.* at § 404.1520(c). A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." *See id.*; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). "Basic work activities" are "the abilities and aptitudes necessary to do most jobs" and include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [and] [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); *see also Bowen*, 482 U.S. at 141.

The purpose of the severity regulation was to create a "threshold determination of the claimant's ability to perform basic, generically defined work functions, without at this stage engaging in the rather more burdensome medical-vocational analysis required by [42 U.S.C.] §

423(d)(2)(A)." *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995). In order to find a medically determined condition to be severe, the ALJ must base his finding on medical evidence that establishes more than a slight abnormality which would have more than a minimal effect on an individual's ability to work. *See* SSR 85-28, 1985 WL 56856, *3 (1985).

Plaintiff contends that the ALJ erred in failing to find that she had a "severe" psychiatric impairment prior to the DLI. *See* Dkt. No. 13 at 4. The Court finds that, after affording the appropriate weight to the different medical opinions as discussed above, the ALJ's determination that Plaintiff's psychiatric conditions did not meet the severity threshold prior to the DLI is not supported by substantial evidence.

Dr. Mahon reported that Plaintiff had suffered from schizophrenia since well before the DLI. *See* T. at 56-57, 333. She reported that Plaintiff was experiencing episodes of paranoid delusions between 2001 and 2010, but these episodes were incorrectly diagnosed as "panic attacks." *See id.* at 60-61, 295. These delusions caused "marked disturbances in maintaining social functioning" and impaired her ability to concentrate. *See id.* at 333. Plaintiff's delusions prior to the DLI included hearing and seeing water running in faucets that had already been turned off, hearing Jesus talk to her, and thinking that she had run a pedestrian over while she was driving her car. *See id.* at 55-56, 334-35. Based on these conditions, Dr. Mahon concluded that Plaintiff struggled in maintaining concentration, could not perform activities on a strict a schedule, could not complete a normal work day without being interrupted by her symptoms, could not appropriately interact with co-workers, and could not respond appropriately to stress in a workplace setting. *See id.* at 336-37.

Plaintiff's treating therapist, Ms. Falise, reported that Plaintiff suffers from paranoid type schizophrenia and PTSD. *See id.* at 323. Ms. Falise determined that these conditions have

13

resulted in extreme limitations to Plaintiff's concentration and persistence, her interaction with others, and her ability to adapt to stressful situations. *See id.* at 322-23. Ms. Falise stated that Plaintiff's mental impairments have been evident nearly her entire life and present Plaintiff "with daily and social functioning limitations making success in any work environment . . . impossible." *Id.* at 332. Specifically, Ms. Falise concluded that Plaintiff's schizophrenic symptoms have plagued Plaintiff since at least 1992. *See id.* at 376.

Plaintiff was treated by licensed professional counselor Michael Riggins starting in 1978 for approximately eight to ten years. *See id.* at 326. Mr. Riggins could not provide the medical records from his treatment of Plaintiff due to the long period of time since that treatment, but he provided the ALJ with a letter describing his interactions with Plaintiff. *See id.* at 371. Mr. Riggins stated that Plaintiff was suffering from "extreme paranoid and delusional thinking" when the two first met. *Id.* Plaintiff "was in a fearful, almost catatonic state." *Id.* Plaintiff was unable to work in ordinary employment because "[s]he was tormented by her fears and [] the deep sense of anxiety [from] working with other people." *Id.* Mr. Riggins concluded that Plaintiff's condition subjected her to a "lifetime of mental anguish and . . . constant fears and idealizations." *Id.*

The record before the ALJ contained statements from Plaintiff's husband, Robert Tousignant, her niece, Marcy Lewis, and her sisters, Carla Larsen and Catherine Lewis. *See id.* at 197-206. Mr. Tousignant reported that he married Plaintiff in 2002 and is with her approximately 16 hours per day, seven days per week. *See id.* at 197. Plaintiff is accompanied by another family member whenever Mr. Tousignant is at work. *See id.* at 44-45, 197. Mr. Tousignant testified at the hearing before the ALJ that, prior to the DLI, Plaintiff suffered from anxiety and panic attacks. *See id.* at 41. Plaintiff was unable to make simple decisions, she could not cook,

14

she could not drive, she could not leave the house to do errands on her own, she became withdrawn from conversations, and she could not sleep. *See id.* at 41-43, 49-51. Ultimately, Mr. Tousignant reported that Plaintiff "has trouble understanding simple directions, answering simple questions, concentrating long enough on a task, and becomes fearful in public places." *Id.* at 197.

Mr. Tousignant testified that, in 2005, Plaintiff quit her job as a house-cleaner because she was unable to leave her house due to fears of leaving the gas on or the water running. *See id.* at 52. During this time, Plaintiff was able to do the laundry and cleaning around her own house. *See id.* at 43. Plaintiff's other job during this period consisted of watching her nephew with Down's Syndrome for two or three hours every day after school. *See id.* at 45. Mr. Tousignant stated that he and Plaintiff's mother were present at all times that Plaintiff was with her nephew. *See id.* Plaintiff would feed her nephew, play with him, and talk to him on a daily basis. *See id.* Plaintiff quit watching her nephew in 2011 because she felt that it was no longer safe for her to watch the child due to her anxiety and nervousness. *See id.* at 46.

Marcy Lewis reported that she has spent two to five hours per day, a couple time per week with Plaintiff since 2001. *See id.* at 199. She stated that, on several occasions in 2005, Plaintiff "appeared to collapse into periods of blank expression and unresponsiveness." *Id.* Plaintiff told Ms. Lewis several times about her fears of leaving water running and running over people when driving to the grocery store, which made it difficult for her to accomplish daily tasks. *See id.* Plaintiff told Ms. Lewis about her constant fears of being abducted or killed and that she "was hearing voices telling her to kill herself." *Id.* Ultimately, Ms. Lewis' opinion is that Plaintiff's conditions "do not allow for following a work schedule and her struggles do not allow her the necessary energy, mental focus, nor emotional stability required for employment." *Id.* at 201.

Ms. Larson reported that she received several phone calls from Plaintiff in 2005 explaining that she was "hanging on by a string," that she was hopeless and depressed, and that "if she had a gun she would have used it." *Id.* at 202. During these phone conversations, Plaintiff's anxiety would cause her to hyperventilate and leave her unable to speak. *See id.* Catherine Lewis similarly reported that she had phone conversations in 2005 in which Plaintiff stated that God wanted her to die and that voices were telling her to kill herself. *See id.* at 204-05. During these conversations, Plaintiff would hide in the bathroom because she did not feel safe. *See id.* at 204. Ms. Lewis has observed Plaintiff staring blankly for long periods of time, after which it is difficult to get her attention and "she then appears confused[,] disoriented, [and] slow to respond." *Id.* at 205. Ms. Lewis stated that Plaintiff is unable to socialize with people other than close family members and that her paranoia and inability to focus make it "difficult for her to complete household tasks, [and] she could not manage a job of any kind." *Id.* at 206.

The ALJ afforded these family members' statements limited weight because of "the fact that [Plaintiff] continued to engage in work activity until 2011." *Id.* at 20-21. The ALJ's determination that Plaintiff's supervision of her nephew after school evidenced her ability to perform basic work activities is not supported by substantial evidence. *See id.* at 21. The type of work that Plaintiff performed in watching her nephew closely conforms to the testimony of the family members and the treating medical providers. During this work, Plaintiff was always at her own home where she felt comfortable, she was under constant supervision by at least one other family member, she did not have any exposure to public spaces, and she did not have to drive a car because her nephew was dropped off and picked up from her house every day. *See id.* at 36-38. Rather than illustrating Plaintiff's ability to perform basic work activities, the details of Plaintiff's position caring for her nephew reinforced the testimony that Plaintiff could not

16

accommodate the stress of being in public spaces, she could not leave the house alone, and that she had to be under constant family supervision.

The evidence from multiple treating medical providers, coupled with the consistent statements from four family members, illustrates that Plaintiff suffered more than a minimal interference with her ability to work as of the DLI. *See* SSR 85-28, 1985 WL 56856, *3 (1985). Thus, the ALJ's decision that Plaintiff's "physical and mental impairments . . . do not significantly limit [her] ability to perform basic work activities" is not supported by substantial evidence.[2] T. at 21.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Commissioner's decision denying disability benefits is **REVERSED** and this matter is **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment and close this case; and the Court further

---

[2] As the case is remanded for further proceedings on the grounds listed above, the Court does not consider Plaintiff's remaining arguments.

17

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED**

Dated: November 19, 2015
      Albany, New York

Mae A. D'Agostino
U.S. District Judge